**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO:


ARTHUR CORRIERI,

     Plaintiff,

v.

THE SCHOOL BOARD OF
MIAMI-DADE COUNTY,

     Defendant.

_____/

## COMPLAINT

Plaintiff, ARTHUR CORRIERI ("Mr. Corrieri"), by and through undersigned counsel,

sues Defendant, THE SCHOOL BOARD OF MIAMI-DADE COUNTY, and states as follows:

### NATURE OF ACTION

1. This is an action for declaratory judgment and damages arising out of Defendant's

creation of a hostile work environment and unlawful termination of employment based upon sex

in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq.

### JURISDICTION AND VENUE

2. This Court has original jurisdiction, pursuant to 28 U.S.C. § 1331, as this action

involves a federal question regarding the deprivation of Mr. Corrieri's civil rights.

3. Venue is proper in the Southern District of Florida, pursuant to 28 U.S.C. § 1391(b),

because the claims arose in this judicial district.

### PARTIES

4. Mr. Corrieri (male) resides in Miami-Dade County, Florida.

5.      Defendant is a political subdivision operating public schools in Miami-Dade County, as Miami-Dade County Public Schools, and an employer within the purview of Title VII.

## ADMINISTRATIVE EXHAUSTION

6.      On July 6, 2023, Mr. Corrieri filed a Charge of Discrimination with the Equal Employment Opportunity Commission (the "EEOC"), asserting that he was subjected to a hostile work environment and unlawful termination based upon sex in violation of Title VII.

7.      On May 31, 2024, the EEOC issued Mr. Corrieri a Notice of Right to Sue.

8.      Mr. Corrieri brought this action within ninety (90) days of receipt of the Notice of Right to Sue.

## STATEMENT OF FACTS

### I.      MR. CORRIERI'S PROFESSIONAL BACKGROUND

9.      Mr. Corrieri holds a doctorate degree in Psychology, i.e., PsyD, from California Southern University.

10.      Mr. Corrieri is a licensed Mental Health Counselor in the State of Florida.

11.      Mr. Corrieri has maintained his Mental Health Counselor license, without any infractions, since 1999.

12.      Mr. Corrieri is designated as a Florida Qualified Supervisor of Mental Health Counseling ("FQMH").

13.      Mr. Corrieri has held the FQMH designation, without any infractions, since 2000.

14.      From 2003 to 2005, Mr. Corrieri worked as an Eastern Field Coordinator, Unaccompanied Alien Children, for the United States ("U.S") Conference of Catholic Bishops.

15.     In his role as Eastern Field Coordinator, Mr. Corrieri was responsible for professional assessment, crisis intervention, and placement recommendations for unaccompanied alien children from Florida to New York.

16.     From 2005 to 2008, Mr. Corrieri worked as a Field Program Specialist for the U.S. Department of Health and Human Services' Office of Refugee Resettlement - Unaccompanied Children's Services.

17.     As a Field Program Specialist, Mr. Corrieri was responsible for crisis intervention and the coordination of clinical services to unaccompanied alien children in cases of child abuse, mental health disorders, and human trafficking.

18.     From 2009 to 2022, Mr. Corrieri worked as Victim Assistance Specialist for the U.S. Department of Homeland Security.

19.     In his role as Victim Assistance Specialist, Mr. Corrieri provided critical resources to federal investigations and criminal prosecutions in South Florida by ensuring that victims, including children and elderly adults, had access to the rights and services, including mental health counseling, to which they were entitled by law

20.     In February 2022, Mr. Corrieri retired from the U.S. Department of Homeland Security.

21.     After retiring, as a means to earn income in addition to his federal retirement benefits, and to accumulate service credits within the Florida Retirement System, Mr. Corrieri applied for a Student Services Support Specialist ("Support Specialist) role with Miami-Dade County Public Schools ("M-DCPS").

## II.      MR. CORRIERI'S EMPLOYMENT WITH M-DCPS

### a.      2021-2022 SCHOOL YEAR

22.      After a successful application, M-DCPS offered Mr. Corrieri a probationary employment contract, commencing on March 17, 2022 and ending on June 9, 2022, to work as a Support Specialist in Royal Green Elementary School for the remainder of the 2021-2022 school year.

#### i.      Support Specialist Role and Duties

23.      On March 17, 2022, Mr. Corrieri commenced his role as Support Specialist in Royal Green Elementary School (the "School").

24.      As a Support Specialist, Mr. Corrieri duties included providing short term individual and group counseling to enhance learner development; providing preventative, developmental, and responsive guidance for individuals, small, groups, and whole classroom settings to assist learners; consulting with teachers, parents, administrators, and mental health professionals to meet learner's needs; leading and facilitating activities which promote a safe and positive school climate; and conducting threat assessments and mental health screening for students in crisis.

25.      The counseling personnel assigned to work at the School, in addition to Mr. Corrieri, were Nancy Carreno (female) ("Ms. Carreno"); a district mental health coordinator (female) that visited the School once a week; and a therapist (female) from a private agency that visited the School once a week.

26.      If a student presented a mental health concern, the School's policy allowed counseling personnel, like Mr. Corrieri, to conference with the student for approximately thirty (30) minutes to assess whether mental health counseling was necessary beyond the conference.

27. If mental health counseling services were necessitated beyond a student conference, then parental notification and consent were required prior to the initiation of mental health counseling services.

28. After providing parental notification and obtaining consent, Ms. Carreno was responsible for assigning students to counseling and therapy sessions with Mr. Corrieri, the district mental health coordinator, or the private therapist.

ii. First Week of Employment

29. The School's administrative leaders who supervised Mr Corrieri were Principal Carlos Diaz ("DIAZ") and Assistant Principal Martha Ortega ("ORTEGA").

30. During his first week of employment, Mr. Corrieri met with DIAZ to discuss his Support Specialist role with the School.

31. During the meeting, DIAZ informed Mr. Corrieri that he was to concentrate his counseling sessions on the students assigned to the Emotional Behavior Disorder ("EBD") classroom.

32. DIAZ informed Mr. Corrieri that a majority of the students assigned to EBD were males with severe conduct issues that he believed would benefit from male counseling personnel like Mr. Corrieri.

33. DIAZ told Mr. Corrieri that, as a man, he should avoid being alone with female students assigned to EBD.

34. Mr. Corrieri found DIAZ's statement to be odd, unprofessional, and offensive as he had not directly or indirectly solicited it.

35. DIAZ did not tell female counseling personnel, or any other female staff members, at the School that they, as women, should avoid being alone with female students.

### iii.    Hallway Work Area

36.    DIAZ assigned Mr. Corrieri an open hallway work area lined with desks to conduct his counseling and therapy sessions.

37.    The hallway, where Mr. Corrieri was to conduct student counseling and therapy, was also used by teachers to move students back and forth between classrooms and the cafeteria.

38.    As a result, the hallway work area provided no privacy for Mr. Corrieri as students passing by on their way to the cafeteria could see, and hear, him conducting counseling and therapy sessions.

39.    DIAZ assigned Mr. Corrieri the open hallway work area as a means to monitor his interaction with female students assigned EBD.

40.    Ms. Carreno, in comparison to Mr. Corrieri, was assigned an office where she would meet with students privately to conduct counseling sessions without interruption.

41.    The district mental health coordinator and the private therapist were also provided private spaces in the School to conduct counseling sessions without interruption.

42.    Because he was new to the School, Mr. Corrieri complied with the work area assigned to him by DIAZ but found the open hallway work area to be unsuitable for conducting individual therapy sessions with students.

43.    At the conclusion of 2021-2022 school year, M-DCPS offered Mr. Corrieri a second probationary employment contract, commencing on August 12, 2022 and ending on June 9, 2023, as a Support Specialist for the 2022-2023 school year.

44.    However, before the 2022-2023 school year began, Mr. Corrieri made several requests to DIAZ for a private space to conduct counseling and therapy sessions.

45.     After being persistent, Mr. Corrieri was assigned to work in a small classroom, with sliding partitions, near the entrance to the School's cafeteria.

b.  2022-2023 SCHOOL YEAR

i.  Building Rapport

46.     Between August 2022 and November 2022, Mr. Corrieri, building on decades of professional experience, worked to develop a good rapport with students and teachers in the School.

47.     For example, Mr. Corrieri would spend a few minutes every morning in the cafeteria speaking with students as a means to allow them to grow comfortable, and gain confidence, in seeking counseling assistance.

48.     Mr. Corrieri also started an afterschool recreational group, with the permission of the After School Care Manager, Lydia Bozzo (female) ("Ms. Bozzo"), which met once a week.

49.      The recreational group consisted of no more than four students (male and female) from the afterschool program, which were selected by Ms. Bozzo based on their good behavior.

50.     Additionally, because Mr. Corrieri was dependable, teachers often called him for counseling assistance with troubled students before contacting the main office.

51.     However, as the only male counseling personnel working at the School, Mr. Corrieri's growing rapport and accessibility amongst the students and teachers aggravated DIAZ and ORTEGA.

52.     As a result, at the beginning of December 2022, and continuing through February 2023, DIAZ and ORTEGA engaged in an increasing series of offensive acts and statements in the workplace based on sex that were severe and pervasive.

ii.   The Hostile Work Environment

1.   December 2022

53.   During the week of December 5, 2022, ORTEGA approached Mr. Corrieri to complain to him about his interactions with the School's safety patrols.

54.   ORTEGA told Mr. Corrieri that the female safety patrols were observed walking by his classroom and greeting him in mornings on the way to their classes.

55.   ORTEGA told Mr. Corrieri that "all kids have problems, all of us staff have problems, just ignore them, and tell them to go back to class."

56.   In addition, ORTEGA told Mr. Corrieri that "Mr. Diaz does not want you talking to girls in private."

57.   Mr. Corrieri was offended and humiliated by ORTEGA's statements as he had not directly or indirectly solicited them.

58.   ORTEGA did not tell the female counseling personnel, or any other female staff members, at the School that they, as women, should not talk to female students in private.

59.   Thereafter, ORTEGA assigned Mr. Corrieri a series of daily administrative duties related to student attendance that impacted his ability to provide counseling services to students.

60.   ORTEGA assigned Mr. Corrieri these duties to reduce his ability to interact and provide counseling services, which was an essential function of his role, to female students in private.

2.   January 2023

61.   At the beginning of January 2023, Mr. Corrieri was called into a meeting with DIAZ and ORTEGA.

8

62. During the meeting, DIAZ accused Mr. Corrieri of holding afterschool counseling sessions with female students without parental authorization.

63. Mr. Corrieri denied the accusation and told DIAZ that he started an afterschool recreational group consisting of male and female students that were selected by Ms. Bozzo.

64. Mr. Corrieri told DIAZ that he did not provide any counseling services while holding the recreational groups.

65. DIAZ reminded Mr. Corrieri that, as a man, he should not meet in private with female students.

66. DIAZ then stated in a hostile manner that "he better not get any allegations that he was touching any of the girls."

67. Mr. Corrieri was left humiliated, appalled, and offended by DIAZ's statements regarding his private interactions with female students as he had not directly or indirectly solicited them.

68. Mr. Corrieri told DIAZ that he was offended and that he would not sit there and be disrespected.

69. DIAZ then told Mr. Corrieri that he could no longer hold the recreational groups and ended the meeting.

70. Following this meeting, Mr. Corrieri observed an increased hypervigilance towards him by DIAZ and ORTEGA.

71. DIAZ and ORTEGA stopped by his classroom every other day to observe his interactions with students.

72. In addition, one morning toward the end of January 2023, DIAZ had the School's custodians place a large number of boxes of books in Mr. Corrieri's classroom while he was not present.

73. The boxes of books were deliberately stacked on the circular table that Mr. Corrieri used to conduct counseling sessions with the students.

74. The boxes were stacked in such a manner that it made it impossible for Mr. Corrieri to use the table for counseling sessions.

75. DIAZ deliberately had the custodians moves the boxes into Mr. Corrieri's classroom to interfere with his ability to provide counseling services.

76. Mr. Corrieri immediately filed a complaint with ORTEGA.

77. In response, ORTEGA told Mr. Corrieri that the boxes would be moved eventually and advised him not to conduct anymore counseling sessions for the time being, instead, he should concentrate on the administrative duties she had assigned him related to attendance.

### 3. February 2023

78. On February 8, 2023, Mr. Corrieri, along with teachers and other staff members, attended the School's Valentine's Day dance in support of the Parent Teacher Association (the "PTA").

79. During the dance, the PTA sold snow cones and popcorn to students for a dollar.

80. During the dance, Mr. Corrieri observed female staff members, like Ms. Bozzo, and female teachers give students dollars to buy snow cones or popcorn.

81. Like the other staff members in attendance, Mr. Corrieri gave three students a dollar each so that could buy snow cones or popcorn.

82. The next morning, on February 9, 2023, Mr. Corrieri went to ORTEGA's office for his daily assignment of administrative duties related to attendance.

83. While Mr. Corrieri was in her office, ORTEGA told him that "Mr. Diaz does not want you talking to girls anymore."

84. Mr. Corrieri was left humiliated and offended by ORTEGA's statement as he had not directly or indirectly solicited it.

85. DIAZ then walked into ORTEGA's office while she was speaking with Mr. Corrieri.

86. In front of Mr. Corrieri, ORTEGA asked DIAZ for confirmation that Mr. Corrieri should not talk to female students.

87. DIAZ confirmed and stated "yes, I want you stay away from all the girls, you gave a dollar at the event yesterday and this is a bad perception."

88. Mr. Corrieri explained to ORTEGA and DIAZ that he was supporting the PTA like other staff members in attendance.

89. DIAZ responded "yeah, but you're male, and it's a bad perception."

90. Mr. Corrieri was left humiliated, demoralized, and offended by DIAZ's statements as he had not directly or indirectly solicited them.

91. DIAZ's continued harassment left Mr. Corrieri feeling paranoid about speaking to female students.

92. On February 10, 2023, Mr. Corrieri asked ORTEGA for permission to speak with two female students who were experiencing conflict in one of the 5th grade classrooms.

93. ORTEGA gave Mr. Corrieri permission to speak with the female students.

11

94. However, not more than one minute into Mr. Corrieri's conference with the female students, DIAZ interrupted and asked why he was speaking to them.

95. ORTEGA, who was close by, told DIAZ that she had given Mr. Corrieri permission to do so.

96. DIAZ became irate and instructed ORTEGA to take the students to his office so that he could end this "Tik Tok drama once and for all."

97. Later that day, ORTEGA told Mr. Corrieri that DIAZ was upset that he was speaking to female students.

98. ORTEGA reiterated and told Mr. Corrieri that it was a "bad perception" for him, as a man, to be speaking to female students in private.

99. ORTEGA also told him that he was prohibited from attending anymore school events.

100. Mr. Corrieri was left demoralized, humiliated, and offended by ORTEGA's statements as he had not directly or indirectly solicited them.

101. Mr. Corrieri was also left confused as he did not know how he should interact with female students who needed counseling services, which was an essential function of his role.

102. As a result, Mr. Corrieri asked ORTEGA for guidance on what do if he received a call from the main office for counseling assistance with a female student.

103. ORTEGA told him "if it's a girl just don't see her."

104. On, or about, February 15, 2023, ORTEGA asked Mr. Corrieri to provide her a copy of his counseling schedule with female students.

105. ORTEGA told Mr. Corrieri that they were going to reassign the female students to other counseling personnel as DIAZ did not want Mr. Corrieri working with female students any longer.

106. On February 16, 2023, Mr. Corrieri sent ORTEGA a text message letting her know that he left a copy of his counseling schedule with female students on her desk per her request.

107. On February 17, 2023, Ortega met with Mr. Corrieri and asked Ms. Carreno to join.

108. During the meeting, ORTEGA instructed Ms. Carreno to reassign the female students on Mr. Corrieri's schedule to other counseling personnel.

109. Ms. Carreno was puzzled by ORTEGA's instruction and asked her why the female students were being transferred from Mr. Corrieri.

110. ORTEGA told Ms. Carreno that DIAZ did not want Mr. Corrieri to counsel any female students in private because it gave a "bad perception" as Mr. Corrieri was male.

111. Ms. Carreno defended Mr. Corrieri and told ORTEGA the all the students, male and female, liked Mr. Corrieri because he was the most available counselor at the school.

112. ORTEGA dismissed Ms. Carreno's defense of Mr. Corrieri and stated "that's what Mr. Diaz wants anyway, it's a bad perception."

113. Ms. Carreno told ORTEGA that, because Mr. Corrieri had developed a close rapport with the female students and their parents, the parents had to be informed of the change.

### iii.   Unlawful Termination

114. On February 24, 2023, Mr. Corrieri was called into a meeting with DIAZ and ORTEGA.

115. During the meeting, DIAZ presented Mr. Corrieri with two letters.

116. The first letter was a resignation letter that had been prewritten for him.

117.   The second letter was a termination letter that did not state any reasons for termination.

118.   DIAZ recommended that Mr. Corrieri sign the resignation letter.

119.   Mr. Corrieri protested and said that he would not sign the resignation letter because he had done nothing wrong that would warrant his resignation.

120.   DIAZ then stated that Mr. Corrieri would be terminated.

121.   Mr. Corrieri asked DIAZ for the reason of his termination.

122.   DIAZ told Mr. Corrieri "well because I told you multiple times not to talk to girls anymore and you do not listen."

123.   Mr. Corrieri asked DIAZ to write those reasons in his termination letter.

124.   DIAZ responded "no, I'm not because I do not have to."

125.   Unlike Mr. Corrieri, the female counseling personnel (Ms. Carrano, the district mental health coordinator, and the private therapist) who worked at the School were not terminated for providing private counseling sessions to female students.

**COUNT I - HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII**

126.   Mr. Corrieri realleges paragraphs 1 through 125 as if fully stated herein.

127.   As alleged in paragraph 4,  Mr. Corrieri belongs to a protected group.

128.   As alleged in paragraphs 53 through 113, DIAZ and ORTEGA, as Defendant's agents and Mr. Corrieri's supervisors, subjected Mr. Corrieri to demeaning and offensive acts and statements based upon sex which were severe and pervasive.

129.    As alleged in paragraphs 53 through 113, Mr. Corrieri did not solicit or welcome the offensive acts and statements

130. As alleged in paragraphs 53 through 113, the offensive acts and statements were sufficiently severe and pervasive to alter the conditions of employment and create a discriminatorily abusive working environment that interfered with Mr. Corrieri's ability to carry out the essential functions of his role.

131. As a direct and proximate result of the hostile work environment created by DIAZ and ORTEGA, Mr. Corrieri suffered lost wages and benefits.

132. As a direct and proximate result of the hostile work environment created by DIAZ and ORTEGA, Mr. Corrieri suffered, and continues to suffer, emotional pain, inconvenience, loss of dignity, and mental anguish.

## COUNT II – UNLAWFUL TERMINATION IN VIOLATION OF TITLE VII

133. Mr. Corrieri realleges paragraphs 1 through 125 as if fully stated herein.

134. As alleged in paragraph 4, Mr. Corrieri belongs to a protected group.

135. As alleged in 114 through 125, Mr. Corrieri suffered an adverse employment action when he was terminated from the Support Services role.

136. As alleged in paragraphs 9 through 21, Mr. Corrieri was qualified for the Support Services role.

137. As alleged in paragraphs 53 through 125, Mr. Corrieri's sex was a motivating factor in the decision to terminate his employment as DIAZ believed that it was improper for Mr. Corrieri, as a man, to provide private counseling sessions to female students.

138. As alleged in paragraph 125, DIAZ treated similarly situated employees outside Mr. Corrier's class – the School's female counseling personnel (Ms. Carrano, the district mental health coordinator, and the private therapist) – more favorably because they were not terminated for providing private counseling sessions to female students.

139.    As a direct and proximate result of DIAZ's unlawful termination, Mr. Corrieri suffered lost wages and benefits.

140.    As a direct and proximate result of DIAZ's unlawful termination, Mr. Corrieri suffered, and continues to suffer, emotional pain, inconvenience, loss of dignity, and mental anguish.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Mr. Corrieri requests that the Court grant him the following relief:

(1)    enter a declaratory judgment finding that Defendant's actions violated Title VII;

(2)    award back pay and loss benefits through the date of his re-employment, and front pay and future loss of benefits if reinstatement is not feasible;

(3)    award compensatory damages, in an amount to be determined at trial, which would compensate Mr. Corrieri for damages, including, but limited to, medical bills, medical premiums, emotional pain and suffering, inconvenience, loss of dignity, and mental anguish;

(4)    award prejudgment interest on all amounts due;

(5)    award reasonable attorney's fees and costs pursuant to 42 U.S.C. § 2000e-5(k);

(6)    order such other relief as this Court deems just and equitable.

<u>**DEMAND FOR JURY TRIAL**</u>

Mr. Corrieri demands a trial by jury on all issues so triable.

Dated this 28th day of August 2024.

Respectfully submitted,

BY: _/s/ Ely Gonzalez_
    ELY GONZALEZ, ESQ.
    Fla. Bar No.:  0055879
    **LAW OFFICE OF ELY GONZALEZ, P.A.**
    2125 Biscayne Blvd, Suite 346
    Miami, Florida 33137

Telephone: (305) 645-8971
Primary email: elygonzalez@eglawpa.com
Secondary email: info@eglawpa.com